SECOND DIVISION

March 2, 1999

No. 1-97-3045

THE PEOPLE OF THE STATE OF )

ILLINOIS, ) Appeal from the Circuit

) Court of Cook County.

Plaintiff-Appellee, )

)

v. )

) Honorable James P.

CEDRIC LEE, ) Flannery, Judge

) Presiding.

Defendant-Appellant. )

PRESIDING JUSTICE GORDON DELIVERED THE OPINION OF THE COURT:

The defendant, Cedric Lee, was found guilty by a jury of home invasion, residential burglary, aggravated battery of a senior citizen and aggravated battery and was sentenced to concurrent terms of 22 years, 15 years, 7 years and 7 years imprisonment, respectively.  On appeal, he raises the following issues:  (1) that he was denied his constitutional right to a trial by jury when the judge failed to respond to two notes sent by the jury during deliberations; (2) that his conviction for aggravated battery must be reversed since that offense is a lesser included offense of aggravated battery of a senior citizen; (3) that his sentence was based on an unconstitutional statute; and (4) that the mittimus must be corrected to reflect the trial judge's oral pronouncement of sentence.  For the reasons discussed below, we affirm defendant's convictions for home invasion, residential burglary and aggravated battery of a senior citizen; we modify defendant's sentences on the home invasion and aggravated battery of a senior citizen convictions; and we vacate defendant's conviction and sentence for aggravated battery.

BACKGROUND FACTS

The defendant was charged with the commission of multiple offenses arising out of an incident that occurred on the evening of September 9, 1995 in the convent of the Our Lady of Guadalupe Church in Chicago.  A citizenship drive was being conducted in the basement of the church from 9:00 a.m. to 4:00 p.m.  Applicants were charged $95 as an application fee (paid by money order) and $20 for the paperwork (paid in cash).

Francisco Velazquez, a citizenship applicant at the church on September 9, 1995, testified that, at about mid-day, he saw an African American male, whom he identified in court as the defendant, walk into the basement and converse with a lady who was processing the applications.  Velazquez stood three feet from the man and described him as being a bit taller than 5 feet 7 inches and having a medium dark complexion, short hair, and a bit of a mustache.  He testified that the man was wearing a short sleeve, red and blue shirt and long pants.  Velazquez also testified that he identified the defendant in a lineup on September 12, 1995 as being the man who was present in the church basement.

Latisa Gusman, a citizenship application processor, testified that she saw an African American man, later identified by her in court as the defendant, come into the church basement on the afternoon of September 9.  The man walked up to her table, asked her for food, and glanced down at the pile of money orders on the table.  She described the man as having a little mustache, some chin hair, short hair on top of his head with a ponytail in the back, light-colored eyes, and a medium complexion.  She stated that the man wore a short-sleeved, light-colored shirt and long, dark pants.  Gusman testified that she made a photographic identification of the defendant on September 11, 1995 and a lineup identification on September 12, 1995.  She stated that she was positive of her identifications of the defendant.

Sister Consuelo Hernandez testified, through an interpreter, that on September 9, 1995, shortly before 7:00 p.m. mass, she was going up the stairs in the convent to bathe.  At that time, she was wearing a silver ring and a medal.  Sister Hernandez was 65 years old.  She heard a sound like someone had broken the door but ignored the noise.  After her shower, she went downstairs to the first floor living room and saw a man sitting on the couch.  The man, who was approximately two meters from her, wore a discolored bluish shirt, long blue pants and white tennis shoes.  She described the man as having short, black hair, no facial hair and green eyes.  She stated that he grabbed her by her neck chain, breaking the chain.  As she bent over to pick the chain up, the man began hitting her on her back.  He grabbed a hatchet, raised it to threaten her, and asked her for money.  Sister Hernandez stated that after the encounter, the ring she was wearing was missing and her medallion lay in a pool of blood.

Sister Hernandez testified that she made a photographic identification of the defendant on September 11, 1995 while she was hospitalized for the injuries she sustained as a result of the attack.  When asked to make an in-court identification of the man who attacked her, Sister Hernandez pointed to the defendant but stated, "Could it be that one?  It looks like him.  It could be him.  Could it be that one?"  She also stated, "I believe I can see but after so many months."

The parties stipulated that Sister Hernandez suffered multiple injuries, was hospitalized, and received intensive rehabilitation until November 16, 1995.  She sustained swelling of her right eye; bruises to her face, forehead, neck and right eye; swelling to the left and right sides of her face; fractured nasal bone; and contusions to her neck, left upper chest, shoulders and upper arms.  The parties further stipulated that the doctors could not evaluate Sister Hernandez's eyes on September 10, 1995 due to severe contusion and non-opening of the eyes.

Sister Regina Bernal, who was 78 years old at the time of trial, testified that, while preparing for 7:00 p.m. mass on September 9, 1995, she heard Sister Hernandez scream that a man was hitting her.  She returned to the convent and saw the left leg and left arm of a man who was trying to open the door.  She also saw Sister Hernandez lying on the floor next to a sofa in a pool of blood.  On the second floor of the convent, drawers had been opened and pillows, blankets and sheets were turned upside down.  A television, VCR, gold wristwatch, and small hatchet were missing.

Officer Fernando Carvajal of the Chicago Police Department testified that on the night of September 9, 1995, he received a tip from a clerk at a liquor store located near the convent.  The clerk stated that a person named Gary White tried to sell a gold watch, broach and ring to him.  Carvajal located White and questioned him.   White gave Carvajal the three items of jewelry.  Carvajal further testified that White told him that he found the items in a garbage can.  White took Carvajal to the garbage can and, upon searching the can, Carvajal found a pair of blue jeans with a red substance on them.  (The parties stipulated that human blood was found on the pants and that the blood on the pants was consistent with blood drawn from Sister Hernandez.  They also stipulated that White's gym shoes tested negative for human blood.)

Chicago Police Officer Joseph Ramirez testified that he received the broach, ring and watch from Officer Carvajal on September 9, 1995.  He further testified that he took the items to the hospital for viewing by Sister Hernandez and that she identified the ring.

Gary White testified at trial concerning his acquisition of the broach, ring and watch.  He also stated that he had a full-

grown beard and weighed 106 pounds on September 9, 1995.  He testified that he weighed 165 pounds at the time of trial.  White stated that he first saw the blue jeans, introduced into evidence by the State, when they were recovered by the police from the garbage can.

At trial, Gary White and the defendant tried on the blood stained blue jeans.  There was a 2-to-3-inch gap between White's waist and the front button of the pants.  When the defendant tried on the pants, his underwear appeared above the jeans and there was "not much curling" on the bottom of the pants.

At the conclusion of the trial, the jury convicted the defendant of home invasion, aggravated battery, aggravated battery of a senior citizen and residential burglary.

DISCUSSION

I.  Jury Deliberations

On appeal, the defendant first argues that he was denied his constitutional right to a trial by jury because the trial court failed to respond to two notes sent by the jury indicating that they were deadlocked.  The defendant contends that the failure to respond had the effect of coercing the deadlocked jury into reaching a compromise verdict that was not trustworthy.  The defendant also contends that he was denied his constitutional right to be present at every critical stage of the proceedings since he was not present when the jury notes were tendered to the court.

The record shows that jury deliberations began at approximately 1:21 p.m. on Friday, June 6, 1997.  
At 
3:00 p.m., the jury sent its first note asking the following five questions:  was Sister Hernandez in the basement during registration; why was Lee picked up; where was Lee picked up; who identified Lee for the pick up; and may the jurors view Lee for eye color and facial hair.  At 3:12 p.m., after discussion with counsel and without objection, the court sent a note to the jury telling them they had all the evidence they were going to receive and to continue to deliberate.

At 4:40 p.m., the jurors sent a second note, described the by trial court as follows:
(footnote: 1)
"We, the jury, have discussed and taken a vote on each count.  We cannot come up with a unanimous vote.  They then list the votes for each count basically; 10 to 2 not guilty [
sic] 
to ten not guilty
, 
2 guilty for most of the counts attempt murder, armed robbery, armed violence et cetera 9 to 3 not guilty to guilty for residential burglary, aggravated battery to a senior citizen, aggravated battery.  Based upon the fact that the jury cannot agree with that identification made by Sister Hernandez of the defendant, we are deadlocked.  There are the signatures of the jurors on the back and there are the signatures.  I did not count them myself."

 Without objection from counsel, the court instructed the jury to continue to deliberate.

The record shows that the trial court and the attorneys left the court premises and reconvened at 8:20 p.m.  Upon their return, the trial judge indicated for the record that, while he and the attorneys were absent, the jury had sent two additional notes, one at 6:20 p.m. and another at 7:25 p.m.  According to the trial court, the 6:20 p.m. note showed:

"attempt murder 2 guilty, 10 not guilty.  Armed robbery 2 guilty, 10 not guilty.  Armed violence 10 guilty, 2 [
sic] 
home invasion 2 guilty, 10 not guilty.  Robbery of a senior citizen 10 guilty, 2 guilty [
sic], 
10 not guilty.  Aggravated battery 8 not guilty 3,[
sic] 
guilty.  Undecided aggravated battery, 8 not guilty, 2 guilty, 1 undecided.  We are deadlocked."

The 7:25 p.m. note, read into the record by the trial court, stated, "We have again deliberated, no one has changed their vote.  We feel further deliberations are fruitless."  At 8:20 p.m., while the court was making a record of these events, the court was notified that the jury had reached its verdict.  The defendant made no objection to the proceedings; and judgment was entered on the jury's verdict.

The State initially argues that the defendant waived any error with respect to this issue by failing to object at trial and failing to raise the issue in defendant's post-trial motion.  Generally, in order to preserve an issue for appeal, the defendant must both contemporaneously object and present the issue in a timely post-trial motion.  
E.g., People v. Enoch, 
122 Ill. 2d 176, 522 N.E.2d 1124 (1988).  However, in accordance with Supreme Court Rule 615, "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court."  155 Ill. 2d R. 615(a).  Under the plain error exception to the waiver rule, reviewing courts will examine issues not properly preserved where the evidence is closely balanced or the alleged error is so fundamental that it denied the defendant a fair trial.  
E.g., People v. Cloutier, 
178 Ill. 2d 141, 687 N.E.2d 930 (1997); 
People v. Thomas, 
178 Ill. 2d 215, 687 N.E.2d 892 (1997).  Here, we must view the evidence as being closely balanced based upon the fact that the jury was deadlocked for several hours and had on three occasions indicated that it could not reach a unanimous verdict.  Thus, we will review the issue raised by the defendant under the plain error exception to the waiver rule.

Our supreme court in 
People v. Childs, 
159 Ill. 2d 217, 636 N.E.2d 534 (1994) set forth specific guidelines with respect to communications with a deliberating jury.  In that regard the court held that the trial court had discretion to decline to answer inquiries from the jury when the instructions are readily understandable and sufficiently explain the relevant law; when further instructions would serve no useful purpose or would potentially mislead the jury; when the jury's inquiry involves a question of fact; or when the giving of an answer would cause the court to express an opinion which would likely direct a verdict one way or another.  
Childs, 
159 Ill. 2d at 228, 636 N.E.2d at 539.  Accord 
People v. Pulliam, 
176 Ill. 2d 261, 285, 680 N.E.2d 343, 355 (1997) (finding court in its discretion could refuse to answer juror's question regarding an inability to reach a unanimous verdict and instead respond "You have your instructions.  Keep deliberating"); 
People v. Banks, 
287 Ill. App. 3d 273, 287-88, 678 N.E.2d 348, 358 (1997) (same with respect to jury question on reasonable doubt); 
People v. Blalock, 
239 Ill. App. 3d 830, 842, 607 N.E.2d 645, 653 (1993) (trial court is not required to answer a jury's question when the jury instructions are sufficient).  Where the jury has posed an explicit question or requested clarification on a point of law arising from the facts about which there is no doubt or confusion, the 
Childs 
court held that the trial court had a duty to provide instruction.  
Childs, 
159 Ill. 2d at 228, 636 N.E.2d at 539 (finding error in court's failure to respond to jury's question regarding various degrees of murder other than referring jury to the instructions they had been given).
  

When the jury communicates to the court its inability to reach a unanimous verdict, the court may, in its discretion, proffer some guidance including the giving of a supplemental instruction such as the 
Prim 
instruction.  
People v. Branch, 
123 Ill. App. 3d 245, 250-51, 462 N.E.2d 868, 872-73 (1984), citing 
People v. Prim, 
53 Ill. 2d 62, 289 N.E.2d 601 (1972), 
cert. denied, 
412 U.S. 918, 93 S. Ct. 2731, 37 L. Ed. 2d 144 (1973).  
Cf.  People v. Cowan, 
105 Ill. 2d 324, 328, 473 N.E.2d 1307, 1309 (1985) (the trial court can choose to have the jury to continue to deliberate even though it has reported that it is deadlocked); 
People v. Novak, 
242 Ill. App. 3d 836, 611 N.E.2d 1203 (1993), 
aff'd on other grounds, 
163 Ill. 2d 93, 643 N.E.2d 762 (1994) (same).  The 
Prim 
instruction informs the jury of the requirement that the verdict be unanimous, that the jury has a duty to deliberate, that jurors must impartially consider the evidence, that jurors reexamine their views and change their opinion if they believe it to be erroneous so long as the change is not for the sole purpose of returning a verdict.  
Prim, 
53 Ill. 2d at 75-

76, 289 N.E.2d at 609.  The time for the giving of such an instruction is discretionary with the trial court based upon its consideration of such factors as the length of time already spent in deliberation and the complexity of the issues before the jury.  
Cowan, 
105 Ill. 2d at 328, 473 N.E.2d at 1309.  
The 
test for the determining the propriety of the supplemental instruction is "whether, upon examination of the totality of circumstances, the language used actually coerced or interfered with the deliberations of the jury to the prejudice of the defendant."  
Branch, 
123 Ill. App. 3d at 251, 462 N.E.2d at 873.  Accord 
People v. Ferro, 
195 Ill. App. 3d 282, 293, 551 N.E.2d 1378, 1385 (1990) ("[a] court's instruction to a jury to continue deliberating should be simple, neutral, and not coercive").

A corresponding issue that arises with respect to the subject of communication with the jury is whether the defendant has been deprived of his right to appear and participate in person and by counsel at all proceedings which involve his substantial rights.  
Childs, 
159 Ill. 2d at 227, 636 N.E.2d at 538 ("A communication between the judge and the jury after the jury has retired to deliberate, except one held in open court and in defendant's presence, deprives the defendant of *** fundamental rights").
  
A jury verdict reached in contravention of that right will be set aside if it is apparent that injury or prejudice resulted from a communication to the jury either by the trial court or a third person outside the presence of the defendant or his counsel.  
Childs, 
159 Ill. 2d at 227-28, 636 N.E.2d at 539
.  
See also 
United States v. Patterson, 
23 F.3d 1239, 1254 (7th Cir. 1994), citing 
Rogers v. United States, 
422 U.S. 35, 39, 95 S. Ct. 2091, 2094-95, 45 L. Ed. 2d 1 (1975) (applying Fed. R. Crim. P. 43(a) and stating, "the defendant has a right to be present at all stages of his trial, 'which has been held to include the giving of supplementary instructions or other communications with a deliberating jury'").  The burden is on the State to prove beyond a reasonable doubt that the error was harmless.  
Childs, 
159 Ill. 2d at 228, 636 N.E.2d at 539.  See also 
Patterson, 
23 F.3d at 1255.

In the instant case, the defendant makes no contention of error with respect to the trial court's communications with the jury at 3:12 p.m. and 4:40 p.m.  Those communications were made in the presence of and with the acquiescence of counsel for the State and counsel for the defendant.  Rather, the defendant argues error occurred when the trial court failed to respond to the jury's notes sent at 6:20 p.m. and 7:25 p.m. which indicated that the deadlock reported at 4:40 p.m. continued to exist.  The defendant contends that the trial court's failure to respond had the effect of coercing the deadlocked jury into reaching a compromise verdict.
(footnote: 2)
The facts in the instant case are unique in that the trial court and counsel for both sides were absent when the 6:20 p.m. and 7:25 p.m. notes were sent by the jury, and that absence appears to be the reason for the lack of response.  We are aware of two cases in which the trial judge was absent while the jury was deliberating and did not respond to their questions before they reached their verdicts.  In 
People v. Sims, 
166 Ill. App. 3d 289, 519 N.E.2d 921 (1988), the trial judge was presiding at the final arguments of defendant's co-defendant while the defendant's jury was deliberating and sent the judge a question.  The jury reached its verdict before the court could consult with defendant's attorney and respond to the question.  The appellate court found no error.  
Sims, 
166 Ill. App. 3d at 311, 519 N.E.2d at 935.  In 
People v. Chandler, 
110 A.D.2d 970, 487 N.Y.S.2d 887 (1985), the trial judge was unaccountably absent from the courtroom for 50 minutes during which time the jury asked a question regarding the testimony and then returned a verdict before the trial judge returned and was able to respond.  There the court held that the delay did not result in the denial of a fair trial to the defendant.

Several cases have dealt with the analogous issue of the trial court's failure to respond to a jury's note, although in those cases the judges were present when the jury notes were delivered.  In 
Cowan, 
105 Ill. 2d 324, 473 N.E.2d 1307, the jury sent a deadlock note to the court almost four hours after deliberations began and was instructed to continue deliberations.  Fifteen minutes later, at 4:14 p.m., and, again, sometime before 7 p.m., the jury sent two more notes advising the court of its deadlock.  The court did not respond to either of those latter notes and sequestered the jury at 7 p.m.  The jury resumed deliberations at 9 a.m. the following morning and 45 minutes later notified the court of its continued deadlock.  The court thereupon notified the prosecutor and defense counsel, for the first time, of its receipt of the four notes.  Defense counsel did not object to the proceedings and, instead, asked that the jury be instructed to continue to deliberate.  Over defense counsel's objection, the jury was given the "Prim" instruction and shortly thereafter returned a verdict of guilty on some of the counts.  On appeal the defendant argued that the court's failure to respond to the first notes "had the effect of improperly hastening a verdict when the 
Prim 
instruction finally was given."  
Cowan, 
105 Ill. 2d at 327-28, 473 N.E.2d at 1309.  In addition to affirming the trial court's discretionary decision to give the 
Prim 
instruction after the fourth note, the supreme court rejected defendant's coercion argument and found no abuse of discretion in allowing the jury to deliberate, after receipt of the two intermediate notes, for eight hours without intervention by the trial court.  Accord 
Smith v. United States, 
389 A.2d 1356, 1361 (D.C. 1978) (trial court's failure to make direct response to jury's communication of lack of unanimity after several hours did not have the effect of coercing the jury into rendering a verdict); 
Edwards v. State, 
668 So.2d 167 (Ala. Crim. App. 1995) (trial court's failure to respond to three deadlock notes from jury over five hours period was not abuse of discretion).  
See Mills v. Tinsley, 
314 F.2d 311, 312-14 (10th Cir. 1963) (trial court's response to deadlock note stating that it had no response and allowing jury to deliberate for two more hours before giving instruction did not amount to coercion); see also 
State v. Bey, 
129 N.J. 557, 610 A.2d 814 (1992) (trial court's failure to answer jury question prior to jury verdict being reached was not reversible error).

Here, while it is unfortunate that the trial court was absent from the courtroom, we cannot say that the court's resultant failure to respond to the two jury notes coerced the jury to reach a unanimous verdict.  The length of their deliberations was not excessive given the fact that the defendant was charged with eight counts (first degree murder, armed robbery, residential burglary, robbery, aggravated battery of a senior citizen, aggravated battery, armed violence and home invasion).  See 
Mills, 
314 F.2d at 313 (considering length of case as a factor that justified extended deliberations); 
Smith, 
389 A.2d at 1361 (same).  See also 
Cowan, 
105 Ill. 2d at 328, 473 N.E.2d at 1309 (complexity of issues is factor relevant ot court's determination whether to give 
Prim 
instruction).  The jury was required to evaluate the evidence as it related to each of these charges and to exclude those which it felt were not sustained by the evidence or which were lesser included offenses.  In that regard the jury found the defendant guilty of half of the offenses for which he had been charged.

Based upon the record, or lack thereof, before us, it would require pure speculation on the part of this court to find that the court's failure to respond to the two deadlock notes coerced the jury into rendering a verdict.  Courts are reluctant to find coercion in the absence of a record to support such a conclusion.  See 
Novak, 
242 Ill. App. 3d at 856, 611 N.E.2d at 1216 (finding it to be rank speculation that trial court's failure to respond to jury's deadlock note coerced jury into reaching verdict 10 minutes later); 
Blalock, 
239 Ill. App. 3d at 841, 607 N.E.2d at 652 (defendant's contention of 
ex parte 
communication between judge and jury viewed as speculative where defendant failed to provide record).  
Cf. Chandler, 
110 A.D.2d 970, 487 N.Y.S.2d 887 (since defendant objected to court's absence during deliberations, court was able to poll jury to determine whether verdict was tainted). There is nothing in the record to suggest that the jury felt unduly pressured to reach a verdict under threat of sequestration (
e.g., Ferro, 
195 Ill. App. 3d 282, 551 N.E.2d 1378; 
Branch, 
123 Ill. App. 3d 245, 462 N.E.2d 868) or under misconception that they could not be deadlocked (
People v. Robertson, 
92 Ill. App. 3d 806, 416 N.E.2d 323 (1981) (jury erroneously told, "you can't be deadlocked")).  It may very well be that the jury felt no compulsion to reach a verdict when responses to their notes were not forthcoming, perhaps attributing the lack of response to the fact that the notes were conveyed during the dinner hour.  The possibility exists that the jurors may have been apprised of the temporary absence of the judge and the attorneys from the court premises.

Moreover, the record does show that the trial court and counsel were apprised of the jury's deadlock upon the court's receipt of the second note at 4:40 p.m.  At that time, without objection from the parties, the court advised the jury to continue to deliberate.  The jury continued to perform its duty to deliberate and eventually reached unanimity.  See 
Mills, 
stating:

"It is not unusual for a jury to advise the court that it is deadlocked and to thereafter agree and return a verdict.  Every trial judge frequently encounters that situation.  Experience in the trial of jury cases demonstrates that jurors are not always the best judges of whether or not they are able to reach a verdict.  In most cases for twelve human minds to agree, it takes careful consideration of the law and the evidence in the case and after that, discussion among the jurors of their views of the case.  It is this kind of serious deliberation that is contemplated in our jury system."  
314 
F.2d at 313-14.

On the record before us, we cannot say that the court's mere silence to the jury's two notes over a three-hour period, which fell during the dinner hour, had the effect of coercing the jury to reach a verdict.  
Smith, 
389 A.2d 1356; 
Edwards, 
668 So.2d 167; 
Cowan, 
105 Ill. 2d 324, 473 N.E.2d 1307.  We believe the jury's verdict was the result of continued deliberation and a careful consideration of the law and the evidence.

In addition to finding a lack of coercion, we also find that the proceedings with respect to the deadlock notes did not deny the defendant his right to be present during a critical stage in the trial.  It is true that "[a] defendant and his counsel have a right to be informed of all communications from the jury and to offer their reactions before the trial judge undertakes to respond."  
Smith, 
389 A.2d at 1360, citing 
Rogers v. United States, 
422 U.S. 35, 39, 95 S. Ct. 2091, 45 L. Ed. 2d 1 (1975).  In 
Smith, 
the court did not respond to the jury's note informing it of a lack of unanimity and did not inform defendant or his counsel of that note until the next day, after another similar note had been received.  On appeal, the court found the error in failing to apprise the defendant and his counsel was harmless because it would have been speculative to presume that, had counsel been apprised of the note, he would have moved for a mistrial.  
Smith, 
389 A.2d at 1361 & n.8.  Accord 
Patterson, 
23 F.3d at 1255 (finding failure to secure presence of defendant and his attorney in handling of jury inquiry harmless error where unlikely that defense counsel would have consulted defendant, that defendant would have suggested a response, or that defendant's counsel would have suggested the response raised on appeal).  Here, the deprivation to the defendant by not being advised of the notes is even more attenuated than in 
Smith, 
since here, unlike in 
Smith, 
the jury notes had not been viewed by the trial court and no action or intentional nonaction by the court occurred in defendant's absence.  Moreover, even if error occurred, it would be harmless since we would be required to speculate as to what action defendant or his counsel would have urged with respect to the notes.  See 
Patterson, 
23 F.3d 1239; 
Smith, 
389 A.2d 1356.  Thus, we must conclude that the deprivation of the right to be present resulted in harmless error.

II.  Lesser Included Offense

The defendant next contends that his conviction for aggravated battery must be reversed since that offense is a lesser included offense of aggravated battery of a senior citizen.  The State concedes this error.  As it is undisputed that the offense of aggravated battery is a lesser included offense of aggravated battery of a senior citizen, we vacate the aggravated battery conviction and corresponding sentence.

III.  Constitutionality of "Truth-in-Sentencing" Provisions

The defendant next argues that his sentence on the remaining convictions should be vacated and remanded because it was based upon an unconstitutional statute.  The defendant was sentenced under the "truth-in-sentencing" provisions of section 40 of Public Act 89-404, titled "An Act in relation to governmental matters, amending named Acts."  Pub. Act 89-404, §40, eff. Aug. 20, 1995 (amending 730 ILCS 5/3-6-3(a)(2) (West 1994)).  Pursuant to that provision, the defendant was eligible to receive no more than 4.5 days of good conduct credit for each month of his sentence with respect to his convictions of aggravated battery of a senior citizen and home invasion.  730 ILCS 5/3-6-3(a)(2)(ii), (iii) (West 1996).  The defendant argues that Public Act 89-404 is unconstitutional because it violates the single-subject rule provided in section 8(d) of article IV, of the Illinois Constitution of 1970.  Ill. Const. 1970, art. IV, §8(d) (stating, "Bills, except bills for appropriations and for the codification, revision or rearrangement of laws, shall be confined to one subject").

While this appeal was pending, our supreme court found Public Act 89-404 unconstitutional in its entirety.  
People v. Reedy, 
Nos. 85191, 85297 (cons.), slip op. at 8 (January 22, 1999).  As a result, we hold that the defendant is eligible to receive the good conduct credit that he would have been eligible to receive under section 3-6-3(a)(2) of the Unified Code of Corrections (730 ILCS 5/3-6-3(a)(2) (West 1994)) as it existed prior to the enactment of the amendatory provisions of Public Act 89-404.

IV.  Correction of Mittimus

As his final argument on appeal, the defendant contends that the written sentence order is inconsistent with the court's oral pronouncement of sentence.

The record in the instant case shows that trial court orally sentenced the defendant on July 10, 1997 to concurrent terms of 22 years for home invasion, 15 years for residential burglary, 7 years for aggravated battery of a senior citizen, and 7 years for aggravated battery.
(footnote: 3)  The clerk's docket entry and two written orders signed by the judge on July 10, 1997 indicated that defendant's sentences were to be concurrent.  Thereafter, on July 17, 1997, the trial court entered a written order labeled "Corrected Mitt."  That order changed the 15-year residential burglary sentence so that it would run consecutive to the aggravated battery of a senior citizen sentence but concurrent to the aggravated battery conviction.  The defendant contends that the July 17, 1997 written order must be vacated as it is in conflict with the trial court's oral pronouncement of sentence.
(footnote: 4)
The State concedes that the mittimus orders of July 10, 1997 and July 17, 1997 should be corrected to reflect the court's oral pronouncement of July 10, 1997.  The State agrees that the July 10, 1997 order must be corrected because it failed to include defendant's conviction of and sentence for the home invasion charge.  It also agrees that the July 17, 1997 order must be corrected because it conflicts with the court's oral pronouncement that defendant's sentences were to be concurrent and not consecutive.

Since we have reviewed the record and we find that the trial court clearly indicated that defendant's sentences were to be concurrent, we order, pursuant to Supreme Court Rule 615(b)(1) (155 Ill. 2d R. 615(b)(1)), that the mittimus be corrected to reflect the following concurrent sentences:  22 years for home invasion, 15 years for residential burglary, and 7 years for aggravated battery of a senior citizen.  See 
People v. Smith, 
242 Ill. App. 3d 399, 609 N.E.2d 1004 (1993) (oral pronouncement of sentence consistent with court's intent controls over written order of sentence).

For the foregoing reasons, defendant's convictions for home invasion, residential burglary and aggravated battery of a senior citizen are affirmed.  Defendant's sentence on the home invasion and aggravated battery of a senior citizen convictions is modified to allow for application of the good conduct credit.  Defendant's conviction and sentence for aggravated battery is vacated.

Affirmed as modified in part and vacated in part.

RAKOWSKI and COUSINS, JJ., concur.

FOOTNOTES
1:
While the jury's first note was included in the record on appeal, the second, third and fourth notes were not.  The content of those notes is taken directly from the record as dictated by the trial court.

2:
We note that the defendant raises no contention of error with respect to the court's response to the 4:40 p.m. note which informed the court of the numerical division of the jury.  As a general rule, where the trial court receives an unsolicited statement regarding the numerical division of the jurors, an order instructing the jury to continue to deliberate does not constitute error.  
E.g.
, 
People v. Watkins
, 293 Ill. App. 3d 496, 507, 688 N.E.2d 798, 805-6 (1997).

3:
We note that pursuant to part II of this order, the aggravated battery conviction and sentence is vacated.

4:
As an additional argument on appeal, the defendant argues that the trial court was without jurisdiction to enter the July 17, 1997 order because the defendant filed his notice of appeal on July 16, 1997.  We do not reach this issue, since we find that the mittimus must be corrected.