THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
VITO M. IOZZO, Defendant-Appellant.

Second District No. 2—89—0678

Opinion filed April 3, 1990.

Patrick J. O'Shea, of Law Offices of Patrick J. O'Shea, of Lombard, for appellant.

James E. Ryan, State's Attorney, of Wheaton (Barbara A. Preiner, Assistant State's Attorney, and William L. Browers, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE McLAREN delivered the opinion of the court:

The defendant, Vito M. Iozzo, was charged by a complaint with the offense of theft in violation of section 16—1(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1987, ch. 38, par. 16—1(a)). The cause proceeded to a jury trial, but the trial court eventually declared a mistrial when the jury could not reach a verdict. After the cause was set for retrial on the same charge, the defendant filed a motion to dismiss the charge on the basis of former jeopardy. The trial court denied this motion, and the defendant now takes an interlocutory appeal from that order pursuant to Supreme Court Rule 604(f) (107 Ill. 2d R. 604(f)). On appeal, the defendant argues that his retrial is barred by the constitutional prohibition against double jeopardy. Two issues are

presented on appeal: (1) whether the evidence presented at the first trial was sufficient to sustain a conviction against the defendant; and (2) whether the trial court abused its discretion when it declared a mistrial in the first trial.

The charge against the defendant arises from events which occurred on the afternoon of Sunday, January 8, 1989. The defendant admits that he was on the premises of the Packey-Webb automobile dealership on this date and that he removed a custom wheel cover from the back of one of Packey-Webb's vans. At trial, the defendant claimed that, although he took the wheel cover when the dealership was not open, he did so in the belief that his cousin, Michael Iozzo, had arranged for the purchase of such an item from Packey-Webb.

Testifying at trial on behalf of the defendant, Michael Iozzo stated that he was the general sales manager for Ogden Avenue Motors. Iozzo testified that Ogden Avenue Motors conducted approximately $500,000 worth of business each year with Packey-Webb and that this commercial relationship continued after the incident on January 8, 1989. Iozzo stated that his cousin, the defendant, called him a few days after the January 1, 1989, holiday to ask if Iozzo could help him obtain a spare tire cover for the defendant's jeep. Iozzo said that he could order such a cover from Packey-Webb, with which he frequently does business, in time for the defendant's planned trip to New Orleans on Monday, January 9. Iozzo stated that he never told the defendant that he should go directly to Packey-Webb's lot and remove a wheel cover from one of the vehicles there. No order was ever placed with Packey-Webb. According to Iozzo, he mistakenly forgot to order a wheel cover from Packey-Webb because of his preoccupation with his mother's terminal illness at about that time.

After the close of the evidence, the jury listened to the prosecutor's closing argument. During his discussion of what the State needed to prove to sustain a conviction, the prosecutor stated:

> "MR. CRONIN [Assistant State's Attorney]: the fourth issue is that defendant intended to permanently deprive the owner of the property. Now, ladies and gentlemen, in order to prove that element, that he intended to permanently deprive the owner of the property, to prove that element absolutely, the People would have to open up [the defendant's] mind and get some sort of a printout and show it to you.
>
> Now, ladies and gentlemen, obviously, we cannot do that, but what we can do is urge you to look at his actions and what did his action tell you about his intent?
> * * *

I'm asking you to look at his actions and use your common sense."

The jury retired to deliberate at approximately 4 p.m. on Friday, May 5, 1989. Immediately after the jury retired, defense counsel made a motion for a directed verdict based on the prosecutor's alleged "admission" during closing argument that the State could not prove the necessary element of intent. The State denied making such an admission. In response to the motion, the trial court stated:

"THE COURT: I think, as I understand, as I understood the comments, he was speaking graphically. You cannot physically see into a person's head, comparing a head or brain to a computer which would give a printout.

It is my understanding of the comment that he was saying that he cannot physically do that. I do not believe he was saying that he could not prove the requisite elements of the case."

The court denied the motion for a directed verdict.

At approximately 7:10 p.m., the trial court noted for the record that the jury had made two written inquiries approximately one hour earlier. The handwritten note from the jury read, "[p]lease define the term 'reasonable' doubt" and asked, "[i]s it possible to review Mike Iozzo's testimony?" As to the first question, the State and the defendant agreed that the proper response would be for the trial court to refer the jury to its original instructions. On the request to review Michael Iozzo's testimony, defense counsel indicated that, in his view, the jury was entitled to hear the testimony again. The trial court, however, instructed the jury that it must decide the case based on the evidence it had already heard.

Later, the jury issued a second written inquiry stating, "[i]s it possible to review the transcript (except for the opening and closing statements)?" The trial court's answer to the question, which was given to the jury about one-half hour later, stated "[a]gain, you must decide the case based upon the instructions you have received and the evidence you have heard."

At approximately 11 p.m., the trial court brought the jury back into the courtroom. The trial court stated that, although the jury had been deliberating for "several hours," the jury indicated that it was making no progress. The court inquired of the foreman of the jury:

"THE COURT: Mr. Howell, I would like to ask you now, on behalf of the jury, if the Court were to ask you to continue your deliberations, do you believe that there is a reasonable probability that you might yet be able to arrive at a verdict?

THE FOREPERSON: Without further guidance, no. We

have been—After the first half hour, there were nine people that voted one way and three people that voted another way.

THE COURT: I don't want you to tell me which way anyone has voted.

THE FOREPERSON: No, No.

Since that point in time there has not been any change, so approximately six hours without any change.

THE COURT: All right. Now, earlier some questions were sent out and responses were made back to the jury. I want to ask you, is there anything further that the Court can do in assisting the jury in arriving at its verdict, such as any other jury instructions or reading of any testimony by the court reporter?

THE FOREPERSON: Yes.

THE COURT; If you cannot answer that question as the foreman, I will allow the jury to go back and make a preliminary vote on that, if you want to decide that amongst yourself."

The jury then retired to consider the trial court's question. At approximately 11:20 p.m., the jury submitted a written inquiry stating that the jury "would like to hear Mike Iozzo's testamony [sic]" and asking, "if there is not enough testamony [sic] to prove or disprove one of the propositions does this mean not guilty?"

Both the prosecutor and defense counsel agreed with the trial court's determination that, with regard to the latter inquiry pertaining to the standard of proof, the jury should be referred to its original instructions. The parties disagreed about the jury's request to hear the testimony of Mike Iozzo again, the defendant favoring a reading of the testimony and the prosecutor opposing it. The trial court, after cautioning the jury not to place undue emphasis on one witness' testimony, had Mike Iozzo's testimony read to the jury.

At approximately midnight, the jury was again brought into the courtroom. The court inquired as to the state of its deliberations:

"THE COURT: Mr. Howell, again, I would like to ask you, I understand that since the last communication, the jury again has been deliberating and has not arrived at a verdict; is that correct?

THE FOREPERSON: Yes.

THE COURT: If the Court were to ask you to continue your deliberations, do you feel that there is a reasonable probability that you might yet be able to *** arrive at a verdict?

THE FOREPERSON: No, sir, I don't.

THE COURT: Notwithstanding, I wish to give the jury this

further instruction at this time."

With the concurrence of both parties, the trial court then proceeded to give the jury the instruction discussed in *People v. Prim* (1972), 53 Ill. 2d 62, 72-76, appropriate when the members of the jury are in disagreement.

At approximately 12:40 a.m., the jury was brought back into the courtroom a final time. The court inquired whether jury deliberations were progressing:

"THE COURT: I understand that the jury again, after the further instruction of the Court, has still not made any further progress.

I would, again, Mr. Howell, like to ask you, if the Court were to ask you to continue your deliberations.

Do you feel there is a reasonable probability that you might yet be able to arrive at a verdict?

THE FOREPERSON: No, sir.

THE COURT: Do you believe that this jury is then hopelessly deadlocked at this time?

THE FOREPERSON: Yes, sir. I feel the sides are opinionated and will not change their view.

THE COURT: I would like to ask you, again, you said earlier that the vote was nine to three. I don't want you to say which way this vote was, but I want to ask you, again, since you have taken your subsequent ballots, does this vote remain the same or has there been any change in the vote of the jury?

THE FOREPERSON: It remains the same.

THE COURT: At nine to three?

THE FOREPERSON: Yes.

THE COURT: It is now twenty minutes to 1:00 in the morning, I would like to ask you if you believe the jury were to recess at this time and then reconvene and continue its deliberation at some later time, if there is any reasonable probability that you might yet be able to arrive at a verdict?

THE FOREPERSON: No, sir. I asked that question. They felt additional time would not help anyone to change their opinion."

The trial court then polled the jurors individually, and each juror was of the opinion that the jury would not be able to agree on a verdict or that agreement was "very unlikely." The court then stated that, because the jury was "hopelessly deadlocked," it would declare the proceedings a mistrial. The defendant did not object to the trial court's ruling.

After the declaration of a mistrial, the cause was reset for a second jury trial. On May 15, 1989, the defendant filed a motion to dismiss the proceedings on the basis of former jeopardy. The defendant argued that a second trial was barred because there was no manifest necessity to declare the first proceedings a mistrial. On June 5, the defendant filed a motion for reconsideration of the court's earlier order denying the defendant's motion for a directed verdict because of the State's "admission" that it could not prove an element of the crime charged. The trial court orally denied both motions on June 15, 1989, and the defendant filed a notice of appeal on July 7, 1989.

On appeal, the defendant contends that his retrial is barred by the constitutional prohibition against double jeopardy (U.S. Const., amend. V), and he advances two arguments in support of this contention. First, the defendant argues that the trial court erred by denying his motion for a directed verdict at the close of all the evidence because the State had made a judicial admission that it could not prove the requisite intent for the crime charged. Second, the defendant argues that the trial court erred by declaring a mistrial because there was no manifest necessity to do so and because the court improperly inquired into the division of the jury. Our jurisdiction over the appeal is appropriate pursuant to Supreme Court Rule 604(f) (107 Ill. 2d R. 604(f)).

 The double jeopardy clause of the United States Constitution protects a defendant from prosecution for an offense after acquittal or conviction of the same offense and prohibits multiple punishments for the same offense. (*People v. Hoffer* (1985), 106 Ill. 2d 186, 197.) The principle underlying this constitutional prohibition is that the State should not be allowed to marshall its great power and resources in repeated attempts to convict an individual of an offense. (*People v. Rudi* (1984), 103 Ill. 2d 216, 223.) Where a mistrial is declared because the jury is unable to reach a verdict, retrial is barred by the prohibition against double jeopardy if the evidence introduced at the first trial was insufficient to convict the defendant. *People ex rel. Daley v. Crilly* (1985), 108 Ill. 2d 301, 308.

The defendant argues that his retrial is, in fact, barred by the prohibition against double jeopardy because the prosecutor in the first trial admitted in closing argument that the State could not prove the intent required to sustain a conviction. This argument is based on the prosecutor's statements that, in order to prove the defendant's state of mind "absolutely," the State "would have to open up [the defendant's mind] and get some sort of printout" and that "obviously, [the State] cannot do that."

■■ ■ Assuming, without deciding, that a prosecutor can make a judicial admission in closing argument (see *People v. Morrison* (1988), 178 Ill. App. 3d 76, 92-93), we believe that the trial court correctly determined that the prosecutor's comments during argument did not constitute an admission. The trial court's interpretation of these comments was that the prosecutor was speaking "graphically." The court believed that the State only conceded that it could not, of course, obtain a "printout" of the defendant's mind as if it were a "computer"; the court did "not believe [the prosecutor] was saying that he could not prove the requisite elements of the crime." A cursory examination of the prosecutor's comments reveals that the trial court correctly found that no admission was made. Quite to the contrary, the prosecutor specifically asked the jury to look to the defendant's actions to infer that he had the intent to deprive Packey-Webb of the custom wheel cover. This is a clear indication that the State never conceded that it could not prove that the defendant had the mental state required to convict him of the offense charged. Accordingly, we reject the argument that there was insufficient evidence to convict the defendant at his first trial.

■ The defendant next contends that the trial court erred when it declared a mistrial in the first proceeding. This argument is based on the defendant's assertions that there was no manifest necessity to declare a mistrial and that the trial court improperly inquired into the division of the jury. The court may properly declare a mistrial and discharge a jury when it is apparent that the jury is hopelessly deadlocked. Under such circumstances, the constitutional prohibition against double jeopardy does not bar a retrial unless the trial court abused its discretion in discharging the jury. *People v. Cole* (1982), 91 Ill. 2d 172, 175.

■ We do not believe that the circumstances here demonstrate that the trial court abused its discretion in declaring a mistrial because the jurors were "hopelessly deadlocked." The jury began its deliberations at 4 p.m. Brought into the courtroom at about 11 p.m., the foreman indicated that the jury would not be able to reach a verdict "[w]ithout further guidance." To aid in the deliberations, the trial court had the testimony of Michael Iozzo read to the jury at about this time. Later, at about midnight, the foreman again indicated that there was no reasonable probability that the jury would reach a verdict. The court did not at this point declare a mistrial and instead encouraged further deliberations consistent with the supreme court's decision in *People v. Prim* (1972), 53 Ill. 2d 62, 72-76. At 12:40 a.m., the jury again indicated that no progress toward a verdict had been

made, and each juror indicated his or her opinion that the jurors would not reach agreement on a verdict.

■ We believe that the trial court gave the jurors ample opportunity to deliberate and that the court declared a mistrial only when it became clear that further deliberations would not produce a verdict. A trial court is to be afforded great latitude in determining how long a jury should be permitted to deliberate before a mistrial is declared. (*People v. Preston* (1979), 76 Ill. 2d 274, 283.) It has recently been held that a period of only two hours' deliberation was sufficient where the jurors clearly indicated that no verdict was likely. (*People v. Wolf* (1989), 178 Ill. App. 3d 1064, 1066.) Here, a total of more than eight hours elapsed from the beginning of deliberations until the mistrial was declared. We feel that the trial court acted within its discretion in declaring a mistrial after the jury's deliberations proved fruitless.

The defendant argues that the trial court gave the jury only 10 minutes to digest the reading of the testimony of defense witness Michael Iozzo, indicating that the court did not give the recounting of this testimony an opportunity to break the impasse. We disagree. First, the record indicates that more than one hour elapsed between the time that Iozzo's testimony was read to the jury and the trial court's declaration of a mistrial. Second, the foreman indicated on two occasions after Iozzo's testimony had been read that agreement on a verdict was unlikely, and not one jury member indicated that further consideration of Michael Iozzo's testimony would have led to a verdict.

■ Finally, the defendant contends that the declaration of a mistrial was tainted by the trial court's improper inquiry into the numerical division of the jury. It is normally error for a trial court to inquire into the numerical division of the jury. (*People v. Duszkewycz* (1963), 27 Ill. 2d 257, 263.) However, where, as here, the trial court receives an unsolicited statement regarding the numerical division of the jurors, it is not error to order the jury to continue its deliberations. (*People v. Farella* (1979), 79 Ill. App. 3d 440, 445.) The trial court here learned of the jury's numerical division only after the foreman volunteered such information.

■ Even if it were error for the trial court to have inquired into the numerical division of the jury, this is not *per se* reversible error unless it results in prejudice to the defendant. (*Duszkewycz*, 27 Ill. 2d at 262-63.) Whether prejudice has occurred depends on the facts of each case. (*People v. Santiago* (1982), 108 Ill. App. 3d 787, 806.) The defendant contends that the trial court should not have rushed to declare a mistrial when it could have inferred that the jury was split

nine to three *in favor of acquittal.* The defendant apparently believes that the pattern of inquiries emanating from the jury indicates that the majority was leaning toward acquittal. Contrary to the defendant's assumption, there is absolutely nothing in the record to indicate whether the majority of the divided jurors favored acquittal or conviction. The jurors who authored the various questions submitted to the trial court could have just as easily been three in number, and not nine. It would have been quite impossible for the trial court to have known what verdict was favored by the majority of the jurors. We believe that the trial court's communications with the jury. after learning of the numerical division were not prejudicial because they were not coercive (*People v. Gregory* (1989), 184 Ill. App. 3d 676, 684-85) and because they were neutral with regard to the ultimate verdict which might result from further deliberations (see *Santiago,* 108 Ill. App. 3d at 806-07). Therefore, the defendant has failed to demonstrate what prejudice could have resulted from the trial court's inquiry into the numerical division of the jury.

Accordingly, the orders of the circuit court denying the defendant's motion to dismiss on the basis of former jeopardy and the motion to reconsider are affirmed.

Affirmed.

UNVERZAGT, P.J., and WOODWARD, J., concur.